MARION A. BLAKE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

VIRGINIA BLAKE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7214, 7215. Promulgated March 19, 1947.

*V. H. Wehmeier, Esq.*, for the petitioners.
*Wesley A. Dierberger, Esq.*, and *Frank M. Cavanaugh, Esq.*, for the respondent.

548

**OPINION.**

HILL, *Judge*: Respondent argues that petitioners lost the property in 1927 when they quitclaimed it to Vollrath and that they then might

have taken a loss for income tax purposes. Respondent further argues that petitioners reacquired one-half interest in the property in 1934 from Vollrath without the payment of any consideration in money or its equivalent and that therefore petitioners have no cost basis with respect to such one-half interest. Respondent admits that petitioners paid $5,000 to Johnson in 1939 for the remaining one-half interest, but claims that the record affords no basis for allocating any portion of this amount to the buildings. Respondent denies that any basis for the property in petitioners' hands arose on account of the $125,000 borrowed by petitioners and spent by them in constructing the buildings. Alternatively, respondent contends that if the money borrowed does in any way give rise to such basis, such basis should not exceed the actual cost to petitioners of satisfying the face amount of the indebtedness.

Petitioners, on the other hand, contend that there was no loss of the property by them in 1927 or at any other time, but that they retained ownership continuously from 1925. Petitioners in this connection take the position that the quitclaim and option transactions merely constituted a form of mortgage security as to Vollrath, under which arrangement petitioners retained ownership. From this view of the facts petitioners argue that the basis of the property for depreciation purposes is $125,000, being the amount borrowed by them and spent in constructing the buildings, plus the $9,213.47 paid by them for painting and decorating the buildings. Alternatively, petitioners contend that, if it be held that they lost and reacquired the property as contended by respondent, then, in that event, the face amount of the mortgage at the time of reacquisition plus any other considerations actually paid at the time of such reacquisition and properly allocable to the buildings constitute their basis for depreciation purposes.

Realism impels us to hold that petitioners never lost their interest in the property involved from the time of its original purchase in 1925 through the taxable years before us, notwithstanding the subsequent transactions among petitioners, Vollrath, and Johnson, or the reorganization or renewal of the first mortgage.

A brief statement of the history of the transactions is considered appropriate. The original purchase price as agreed upon between petitioners and Vollrath was $104,390, of which only $6,351 was paid. The property was unimproved at the time of purchase. The purchase agreement contemplated that petitioners would improve the property as a housing facility. To enable petitioners to finance such improvement, Vollrath took a mortgage on the property for the balance of the purchase price, subject to a first mortgage given by petitioners to secure a loan of $125,000. With the money secured on the first mortgage petitioners completed 73 houses on the property early in 1926.

Petitioners also expended an additional amount of $9,213.47 for painting and decorating the buildings. It is obvious, we think, that Vollrath and petitioners recognized dependence on the success of the housing development for payment of both the first and second mortgages.

In 1927 petitioners were in default in their payments of the purchase price. In that year Vollrath instituted foreclosure proceedings on his purchase price mortgage because of such default. Following discussions between the parties an agreement was reached whereunder Vollrath granted petitioners more time for making the purchase payments. Under this agreement the foreclosure proceedings were discontinued, petitioners and Ellis and wife gave Vollrath a quitclaim deed to the property and took an option back to purchase the property for an amount intended to approximate the unpaid balance due on the original agreement of purchase, to wit, $101,153. By this option the time for the payment of the price originally agreed upon was extended to August 1, 1930. Petitioners never exercised the option, but remained in possession and control of the property during the period of the option and made payments on their first mortgage indebtedness out of income and sale proceeds from the property.

It is apparent from the record and the facts found that this latter arrangement did not, and was not intended to, terminate petitioners' interest in the property acquired under the original purchase agreement, but that it was made for the purpose (1) to give petitioners more time in which to make payments of the purchase price and (2) to obviate the delay and expense of foreclosure proceedings in the event of final default by petitioners.

At the expiration date of the option, August 1, 1930, Vollrath gave petitioner Marion Blake a new option to purchase the property. Ellis and wife had dropped out of the picture. By this option the terms and method of payment of the purchase price were modified as set forth in our findings of fact. The expiration date of the new option was August 1, 1935. This option was not exercised, but petitioners continued in possession and control of the property and continued to make payments on their first mortgage indebtedness from the income and proceeds from the property.

In 1934 Vollrath and petitioners entered into an agreement which supplanted the last option agreement above described. Under this new agreement the original purchase price was converted from a definite figure to an equal share of the profits from the development project between Vollrath and petitioners upon the liquidation thereof and after payment of the first mortgage. Pursuant to such new agreement, Vollrath quitclaimed to petitioners a one-half interest in the property under date of October 5, 1934, and petitioners were to continue to operate, manage, and liquidate the property in an attempt

to pay off the first mortgage and thereafter to pay over to Vollrath one-half of the remaining profits, if any. No profits were realized under this agreement.

Under the terms of this last agreement, as well as in all the recited intermediate transactions between the parties following the original purchase agreement, a continuing interest of the petitioners in the property was recognized by Vollrath.

In 1939 Vollrath conveyed to one Johnson the remaining one-half of the property involved and petitioners paid Johnson $5,000 for a quitclaim deed to such one-half interest. Thereafter petitioners held full title to the property subject to the first mortgage.

These transactions, when considered realistically and in their entirety, amount to a purchase of the land by petitioners from Vollrath and the construction of a housing project by petitioners with money borrowed by them and secured by a first mortgage on the premises. Despite the various forms into which petitioners' relationship with Vollrath was cast, the basic character of that relationship remained constant and consisted of a purchase money mortgagor-mortgagee relationship, with petitioners as the vendees and Vollrath as the vendor of the land.

In this view of the transactions, petitioners, paid $11,351 for the land. This amount is made up of the $6,351 paid to Vollrath in cash in 1925 and the $5,000 paid by petitioners to Johnson in 1939. None of the $5,000 paid Johnson is attributable to the buildings, because we consider the so-called one-half interest acquired from Johnson as in the nature of a mortgage, which mortgage, despite the fact it may have in part covered the buildings, arose from and secured petitioners' indebtedness to Vollrath for the land. Petitioners do not contend otherwise.

The cost to petitioners of the buildings amounts to $134,213.47, consisting of the amount of $125,000 borrowed on the first mortgage and spent in construction, and the amount of $9,213.47 spent for painting and decorating the buildings shortly after their construction. On brief, petitioners do not claim that the $3,900 spent in piping gas to the buildings should be included in depreciable basis. The amount of $134,213.47 represents actual cost of the buildings to petitioners and we hold that this amount constitutes petitioners' original basis for depreciation. Respondent's attempt to exclude the $125,000 from basis, or at least to limit the basis on account of such sum to the actual cost to petitioners of retiring their indebtedness, therefore is based on a failure to distinguish between actual cost of constructing the buildings, on the one hand, and the retirement of an indebtedness for less than par, on the other. In this connection it is significant that petitioners' indebtedness was not owing to the building contractors.

The building contractors had already been paid in full. The subsequent satisfaction of this indebtedness therefore did not reduce cost, but constituted a satisfaction of indebtedness for less than par, resulting in income to petitioners, which aspect will be discussed below.

The first mortgage was renewed on May 9, 1940, by agreement entered into between petitioners, the mortgagors, and the Equitable Trust Co., as mortgagee-trustee. At the time of such renewal there were outstanding bonds secured by the mortgage in the face amount of $109,000, plus interest from February 20, 1930. In the renewal agreement past due interest was canceled, the interest rate reduced for the future, and the time of the maturity of the bonds extended to August 20, 1948. On May 4, 1942, the mortgage was completely paid and satisfied. The payments were made by application to the mortgage debt of $81,800 face amount of the mortgage bonds and the payment of $27,200 in cash by petitioners. The mortgage bonds had been purchased from brokers on the open market at a total cost of $24,573.53. We hold that the difference between the purchase price and the face amount of the bonds represented income to petitioners. *United States* v. *Kirby Lumber Co.*, 284 U. S. 1; *Helvering* v. *American Chicle Co.*, 291 U. S. 426; *Lewis F. Jacobson*, 6 T. C. 1048. We further hold that such income was realized as and when petitioners bought the bonds at less than face value and not when such bonds were surrendered to the trustee for cancellation. *Central Paper Co.* v. *Commissioner*, 158 Fed. (2d) 131; *Tennessee Consolidated Coal Co.* v. *Commissioner*, 145 Fed. (2d) 631; *Montana, Wyoming & Southern R. Co.* v. *Commissioner*, 77 Fed. (2d) 1007; *Garland Coal & Mining Co.* v. *Helvering*, 75 Fed. (2d) 663; *American Brake Shoe & Foundry Co.* v. *Interborough Rapid Transit Co.*, 19 Fed. Supp. 234.

Petitioners, in their returns, have taken depreciation on the buildings at the rate of 5 per cent. On brief petitioners contend that the rate is too high and should be 3 per cent. Respondent insists on a 5 per cent rate. We hold that 5 per cent is the proper rate of depreciation, since, in our opinion, petitioners have not furnished an adequate basis in the record for a lesser rate. It follows that petitioners are entitled to depreciation on account of the property in question for each of the taxable years 1940 and 1941 at the rate of 5 per cent on such part of petitioners' original cost basis of $134,213.47 as is properly allocable to the 67 buildings in respect of which petitioners took deductions for depreciation in such taxable years. The evidence of record does not enable us to determine the basis of such allocation. The parties may stipulate such basis for the computation under Rule 50; otherwise a further hearing will be necessary for the presentation of evidence as to such basis.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

OPPER, *J.*, dissenting: The present result seems to me irreconcilable in principle with *Hilpert* v. *Commissioner* (C. C. A., 5th Cir.), 151 Fed. (2d) 929. That decision, it is true, was a reversal of the Tax Court, but if we are now following the original view expressed in 4 T. C. 473, notwithstanding the reversal, I think we are at least compelled to say so.

Turner, *J.*, agrees with this dissent.